```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x
                                    :
UNITED STATES OF AMERICA
                                    :    11 Cr. 227  (AKH)
        - v. -
                                    :
DAVID GRIFFITHS,
                                    :
             Defendant.
                                    :
- - - - - - - - - - - - - - - - - - x
```

**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**

```
                            PREET BHARARA
                            United States Attorney for the
                            Southern District of New York,
                            Attorney for the United States
                                 of America




CARRIE H. COHEN
JUSTIN ANDERSON
Assistant United States Attorneys
       - Of Counsel -
```



*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*

*One Saint Andrew's Plaza*
*New York, New York 10007*

May 9, 2013

**By ECF and Hand Delivery**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

      Re:  **United States v. David Griffiths**,
           **11 Cr. 227 (AKH)**

Dear Judge Hellerstein:

    The defendant David Griffiths ("Griffiths" or "the defendant") is scheduled to be sentenced in the above-referenced case on May 10, 2013 at 11:00 a.m.  The Government respectfully submits this letter in advance of that sentencing and in response to the defendant's submission dated May 7, 2013 ("Def. Mem.").

    For the reasons discussed below, the Government agrees with the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") calculations of the United States Probation Office (the "Probation Office") in its Presentence Investigation Report dated January 18, 2013 ("Presentence Report" or "PSR") and recommends a sentence of imprisonment within the Guidelines range of 51 to 63 months' imprisonment.  A Guidelines sentence is sufficient but not greater than necessary to serve the legitimate purposes of sentencing, especially in light of the seriousness of the offenses and the defendant's significant abuse of his position of trust.

## BACKGROUND

**A.    The Charges**

    Information S3 11 Cr. 227 (AKH) (the "Information") was

The Honorable Alvin K. Hellerstein
May 9, 2013
page 2 of 12

filed on April 24, 2012, in three counts.  Count One charged Griffiths with making false statements to the government, in violation of Title 18, United States Code, Section 1001.  Count Two charged Griffiths with obstruction of justice, in violation of Title 18, United States Code, Section 1512(c)(2).  Count Three charged Griffiths with mail fraud, in violation of Title 18, United States Code, Section 1341.  (PSR ¶¶ 1-4).

Counts One and Two of the Information arose from Griffiths's production of documents purporting to be minutes from two meetings ("Board Minutes") of the Board of Directors (the "Board") of the Neighborhood Enhancement Training Services, Inc. ("NETS"), which was a not-for-profit corporation located in Bronx, New York.  As alleged in the Information and found by the jury, the Board Minutes falsely stated that the Board had certain discussions and had taken certain actions with respect to salary purportedly owed to the defendant and with respect to money he allegedly lent to NETS.  Griffiths provided the false Board Minutes to the Federal Bureau of Investigation ("FBI") in June 2009 in response to a Grand Jury Subpoena issued from this District and served on NETS.  (PSR ¶¶ 2, 3).

Count Three of the Information related to Griffiths's September 13, 2010 mailing of a grantee questionnaire (the "Questionnaire") to the Dormitory Authority of the State of New York (the "Dormitory Authority") in which he falsely represented that, within the past five years, neither NETS, any director or officer, nor any affiliated or related companies had been the subject of a criminal investigation, civil investigation by any governmental agency, or any tax liens or judgments.  (PSR ¶ 4).

**A.   The Trial And Guilty Verdict On All Counts**

Trial began on May 1, 2012 and concluded on May 30, 2012 when the jury returned a verdict of guilty on all three counts of the Information.  (PSR ¶ 7).

**1.   The Government's Case**

Much of the Government's direct case at trial was not in dispute.

It was undisputed that at all times relevant to the Information, the defendant served as the Executive Director of NETS and as the treasurer for the political campaign of then New

The Honorable Alvin K. Hellerstein
May 9, 2013
page 3 of 12

York State Assemblyman Peter M. Rivera.  In addition, the defendant also worked for Assemblyman Rivera's law firm (the "Law Firm") and ran Assemblyman Rivera's for-profit corporation, R&S Group, Inc. ("R&S").

Assemblyman Rivera testified that he did not put Griffiths in charge of NETS or authorize him to become its Executive Director.  (Trial Transcript ("Tr.") 93-34).  Rather, the evidence showed that Assemblyman Rivera asked Griffiths to help NETS renovate a building it had purchased (the "Building"), and then Griffiths unilaterally decided that he should be NETS's new Executive Director.  In addition, as explained by NETS's former bookkeeper Nancy Herbert Pilate, Griffiths unilaterally authorized his own salary and other payments of funds to him.  (Tr. 290).

As Assemblyman Rivera explained at trial, NETS received its operational funding through government grants that he sponsored.  (Tr. 43).  In addition, Assemblyman Rivera sponsored more than $1 million in grants to NETS to buy and renovate the Building and those grants were administered by the Dormitory Authority.

The Government demonstrated at trial that the defendant controlled NETS, the Law Firm, and R&S, all of which he ran out of the same offices, until the entities were evicted in mid-2008 for failure to pay rent.  Indeed, the evidence showed, and the defendant admitted that by mid-2007, the defendant's previous sources of income – namely from the Law Firm, R&S, and another law practice – had dried up.  It was at this time that the defendant unilaterally put himself on NETS's payroll, thereby enabling him to collect a bi-weekly paycheck from NETS.  (Tr. 938).[1]

The evidence further showed, and it was undisputed that, by 2008, NETS, like the Law Firm and R&S, also had run out of cash

---

[1] The evidence also showed that the defendant previously authorized $33,000 to be paid from NETS to himself, namely monies paid to him by NETS in 2005, recorded on NETS's books and records as a "loan," as well as additional money in 2004, recorded on the check as "salary."  The Government introduced evidence at trial that the 2005 "loan" was not an advance of salary, as the defendant later represented to the FBI, because he failed to declare such money as income and did not receive a W-2 or Form 1099 from NETS in relation to such payment.

The Honorable Alvin K. Hellerstein
May 9, 2013
page 4 of 12

and effectively ceased operation.  While many of the government grants awarded to NETS were outstanding and available for payment, beginning in or about 2005, such funds were frozen because NETS had failed to file its required annual tax returns ("Form 990s") with the IRS and the Office of the Attorney General of the State of New York ("OAG") for 2006 and 2007.  (Tr. 964).  And while it was undisputed that from 2005 through to 2008, NETS had paid many of its operating expenses by taking "loans" the defendant authorized from the Law Firm and R&S, by 2008, the Law Firm and R&S Group no longer had any money to lend to NETS.  It was around this time that, at the defendant's direction, NETS and R&S stopped paying their payroll and other taxes and subsequently became subject to certain tax liens and judgments, which the evidence, including certified copies of tax notices, liens, and judgments, showed the defendant knew remain unsatisfied at the time he submitted the Questionnaire.  (Tr. 983).

Beginning in October 2008, the evidence showed that the FBI, working with this Office, interviewed various individuals related to NETS, including the three Board members, Lizandra Martinez, NETS's former Program Director, (Tr. 806), and Pilate, (Tr. 311), and served both document and personal appearance Grand Jury Subpoenas on NETS, its Board members, and its employees.  (Tr. 905).  It was undisputed that the primary area of inquiry was the finances of NETS and payments to Griffiths, particularly, the $33,000 "loan" paid to him in 2005.  (Tr. 968).

After the FBI's investigation of NETS became overt, it was undisputed that Griffiths, for the first time, called a meeting of the Board, which was held in December 2008, (Tr. 952), with a follow-up meeting held six months later in June 2009.  According to the Board Minutes, at those meetings, the Board made certain motions and took certain votes related to the defendant's salary, both prospective and retrospective back to 2003, when he first started working at NETS, and the alleged "loans" from the Law Firm and R&S Group to NETS.  (Tr. 366).

Also in 2009, a month prior to the second Board meeting, the OAG contacted the defendant and began its civil investigation of NETS with a focus on its finances and payments to Griffiths, including the $33,000 "loan" paid to him in 2005.  (Tr. 581).  The evidence showed that throughout 2009, the defendant produced thousands of pages of documents to the OAG on behalf of NETS in response to the OAG's investigation and had discussions with the OAG, including a conversation during which then Assistant

The Honorable Alvin K. Hellerstein
May 9, 2013
page 5 of 12

Attorney General Nathan Reilly told the defendant that the OAG investigation was not closed. (Tr. 584).

In 2009, while the federal and state investigations were ongoing, the defendant, working with an accountant hired by NETS who testified at trial, George Pristouris, filed NETS's 2006 and 2007 Form 990s. Through the testimony of Pristouris and certain documents and e-mails between Griffiths and Pristouris and/or his staff, the Government showed that in order for Pristouris to complete the delinquent 2006 and 2007 Form 990s, Griffiths needed the Board to approve his salary, (Tr. 136), both retroactive and prospective, as well as the "loans" to NETS from the Law Firm and R&S. (Tr. 156).

Regarding Counts One and Two of the Information and the false Board Minutes, the Government's proof at trial included testimony from the three Board members about what actually occurred during the two Board meetings and about their knowledge, or lack thereof, regarding management, governance, and finances of NETS. Specifically, Patricia Tomasulo and Anthony Bonelli both testified that much of what was stated in the Board Minutes regarding what was told to the Board about Griffiths's compensation and what the Board approved simply was not true. (Tr. 354-57, 465, 471-73). Cora Booth, the third Board member, also testified for the Government, although she could not remember much of what had happened or did not happen at the Board meetings. In addition, through cross-examination of Martinez, the Government further demonstrated that much of what was stated in the Board Minutes simply was false. (Tr. 810-11).

The Government also introduced at trial e-mails between the defendant and Pristouris and his staff and e-mails between the defendant and Martinez related to Griffiths's drafting of the Board Minutes. Those emails and related testimony demonstrated Griffiths's motive for holding the Board meetings, which was in response to the criminal investigation and the accountant's refusal to approve Griffiths's retroactive and prospective salary increase without express Board approval. (Tr. 981-82). Such testimony also demonstrated the undisputed fact that Griffiths was responsible for drafting and finalizing the Board Minutes, (Tr. 971), as well as providing them to the FBI in response to the Grand Jury Subpoena. (Tr. 549-50).

In September 2010, a year after providing the false Board Minutes to the FBI, it was undisputed that the defendant sent the Questionnaire, among other related documents, to the Dormitory

5

The Honorable Alvin K. Hellerstein
May 9, 2013
page 6 of 12

Authority in an attempt to obtain a $400,000 grant NETS had been awarded in 2008 to complete the renovations to the Building. (Tr. 984). The evidence at trial showed that, upon receipt of such documents, the Dormitory Authority did not further process the grant as it was aware of the federal criminal investigation of NETS. (Tr. 656).

Regarding the mail fraud charged in Count Three of the Information, the Government's proof at trial consisted of, among other things: testimony from NETS's employees, namely Martinez and Pilate; testimony from the three Board members; testimony from law enforcement officials, namely FBI Special Agent Bullets Campbell, to whom Griffiths made certain admissions, and Nathan Reilly, a former Assistant Attorney General for the OAG and now an Assistant U.S. Attorney in the Eastern District of New York; and an attorney at the Dormitory Authority, Sara Richards. In particular, the testimony demonstrated that, at the time Griffiths mailed the Questionnaire to the Dormitory Authority, he was aware, at a minimum, that NETS and/or he was being investigated by the FBI as well as by the OAG. In addition, the evidence showed that Griffiths knew that NETS was the subject of unsatisfied tax liens and judgements. (Tr. 983).

### 2. The Defense Case

In addition to calling Martinez, Griffiths called NETS's attorney Hans O'Connell (who submitted a letter on Griffiths behalf for sentencing) and NETS's former accountant Frank Weyrauther. Griffiths also testified on his own behalf. O'Connell testified about a meeting with SA Campbell during which SA Campbell made it clear that NETS and the compensation being paid to Griffiths were under investigation, although the agent did not state who or what was the "subject" of the investigation. O'Connell also testified, unconvincingly, that he advised Griffiths that he was not the "subject" of an investigation as that term was understood by O'Connell based on his time in the Bronx District Attorney's Office. (Tr. 734). Based on such testimony, the defense argued that Griffiths's failure to disclose the criminal investigation to the Dormitory Authority was somehow excusable. Weyrauther tried to substantiate the characterization of the $33,000 Griffiths paid himself as a "loan," although such testimony was wholly unconvincing. (Tr. 830).

Griffiths testified in his own defense and admitted much of the factual background that the Government had established on its

6

The Honorable Alvin K. Hellerstein
May 9, 2013
page 7 of 12

direct case. Griffiths, however, claimed that whatever the Board Minutes said had transpired at those two Board meetings had in fact happened, and that the Board members had reviewed certain documents at those meetings. (Tr. 913). The Court, who, along with the jury, was able to assess Griffiths's credibility, clearly did not find his testimony persuasive. Griffiths further claimed that, at the time he submitted the Questionnaire, he did not believe that NETS or he had been the subject of a criminal or civil investigation or subject to any tax liens or judgments. (Tr. 932). The Government's evidence, however, demonstrated that this testimony simply was not credible.

In addition, the defense called several character witnesses, but none of them had any knowledge of the facts underlying the charged crimes. Indeed, both witnesses admitted that they did not know Griffiths worked at NETS and had no knowledge of the Board Minutes or the Questionnaire. (Tr. 712, 721). Accordingly, their testimony was of limited, if any, value.

### C. The Probation Office's Guidelines Calculation and Sentencing Recommendation

The Probation Office calculated a total Guidelines offense level of 24, just as the Government had calculated in the Pimentel letter it sent to the defendant prior to trial. (PSR ¶ 24.) This calculation was based on (1) a base offense level of 14 for false statements and obstruction of justice as charged in Counts One and Two; (2) a two-level increase based on the fabrication of an especially probative record; (3) a two-level increase based on Griffiths's abuse of a position of private trust and use of a special skill in a manner that significantly facilitated the commission of the offenses; (4) a one-level increase based on a multiple count adjustment for the mail fraud charged in Count Three. (PSR ¶¶ 21-43). The Probation Office calculated that the defendant's Criminal History Category was I, yielding a Guidelines range of 51 to 63 months' imprisonment. (PSR ¶ 50 and at 25).

Griffiths contests two components of this calculation. First, Griffiths challenges the two-level enhancement under Section 2J1.2(b)(3)(B) for "the fabrication of an especially probative record." (PSR ¶ 26). According to Griffiths, "there was no evidence at trial to even suggest that Mr. Griffiths destroyed or altered documents to thwart the investigation." (Def. Mem. at 3). Griffiths has it exactly backward. The basis for his obstruction of justice conviction was his alteration and

7

The Honorable Alvin K. Hellerstein
May 9, 2013
page 8 of 12

fabrication of the Board Minutes in order to justify his compensation and other financial irregularities at NETS. Griffiths created those documents in order to deceive the FBI into believing that nothing was amiss at NETS. Under the circumstances, this enhancement is entirely appropriate.

Second, Griffiths believes that he did not abuse a position of private trust under Section 3B1.3 because he "did not occupy a position of trust with the government." (Def. Mem. 3). That argument misses the mark entirely, because it was a position of <u>private</u> trust in connection with his work a NETS that Griffiths abused by covering up his attempts to obtain NETS's funds through deception. Griffiths did not need to occupy a position of trust in relation to the Government in order to receive this enhancement. Griffiths's alternative argument that the enhancement is already included in the underlying offense, (Def. Mem. at 3-4), equally is misplaced, as Griffiths's false statement and obstruction of justice offenses do not inherently require that a defendant occupy a position of trust within a private entity. Accordingly, this enhancement also was proper.

Based on a Guidelines range of 51 to 63 months' imprisonment, the Probation Office recommends a sentence at the bottom of the Guidelines range of 51 months' imprisonment on each count to run concurrently; one year of supervised release; no fine; no forfeiture; and a $300 mandatory special assessment. (PSR at 25).

For the reasons set forth below, the Government respectfully submits that a sentence within the Guidelines range of 51 to 63 months' imprisonment is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

## DISCUSSION

The Probation Office's recommendation of a bottom of the Guidelines sentence of 51 months' imprisonment is based on the seriousness of Griffiths's offenses and his lack of any compelling personal circumstances that would warrant a below-Guidelines sentence. (PSR at 26). The defendant argues for a non-custodial sentence of time served and community service based on his claim that he has been punished enough by the shame and grief "visited" upon him as a result of this case, (Def. Mem. at 7), and his personal circumstances, namely his 17 and 14 year old daughters who depend on him and a stroke he suffered from more than five years ago. The defense further argues that any

8

The Honorable Alvin K. Hellerstein
May 9, 2013
page 9 of 12

custodial sentence would be greater than necessary and serve no legitimate sentencing goal based, in part, on his claim that there is no need for specific deterrence. (Def. Mem. at 1, 6).

Contrary to defense claims, a Guidelines sentence of 51 months imprisonment is appropriate here especially given the nature and seriousness of Griffiths's offenses. Moreover, unlike many defendants who appear before this Court, Griffiths has no compelling personal circumstances that warrant a non-Guidelines sentence. In addition the need for specific and general deterrence support a Guidelines sentence as well.

Griffiths was entrusted with public funds to run a not-for-profit corporation in the Bronx that was supposed to help elderly individuals and children in the community. While serving in such position of trust, Griffiths abused that trust and created false Board Minutes in an attempt to obtain compensation to which he was not entitled. By producing those false minutes to the FBI, Griffiths obstructed a federal investigation thereby corrupting the Government's search for truth. Compounding those lies, Griffiths attempted to obtain state funds by lying about the FBI's criminal investigation and claiming that it did not exist. By engaging in such conduct, Griffiths again violated his position of trust at NETS and attempted to defraud a state agency.

Griffiths argues that he devoted a "substantial amount of time and effort for very little compensation" (Def. Mem. at 5) to NETS but the evidence at trial simply does not support such a claim. To the contrary, the records demonstrated that the defendant kept no time records of his work at NETS although all other employees did so and was working for other companies and a law firm as well as running several political campaigns at the same time that he supposedly was working full-time at NETS. In addition, Griffiths unilaterally authorized a salary for himself at various points during his tenure and authorized $35,000 in payments to himself allegedly as a "loan."[2] Indeed, it is hard

---

[2] In light of the jury's verdict, the Government no longer merely "alleges" that Mr. Griffiths "sought some compensation for himself," (Def. Mem. at 6), because those facts were proven at trial. Accordingly, the defense's related claim that Griffiths did not "unduly enrich" himself, (Def. Mem. at 6), equally is flawed. The motive for his crimes was to line his own pockets. Griffiths's lies in the Board Minutes about Board approval of his

9

The Honorable Alvin K. Hellerstein
May 9, 2013
page 10 of 12

to credit Griffiths' claim that he cared so much about the Bronx residents, for whom he was entrusted with public funds, when it was his own misdeeds that caused NETS to become defunct.  As a direct result of Griffiths' misconduct, NETS ceased to function and those residents no longer have the services the State tried to provide to them through funding NETS.  Accordingly, Griffiths's service to NETS actually is an aggravating sentencing factor rather than a mitigating one.

     In addition, Griffiths's claims that his "life history reveals respect for the law" and that he is "trustworth[y] and reliab[le]," (Def. Mem. at 5), simply are not true.  The defense submission and all the letters, even those written by his former law partners and clients, all conveniently omit the critical fact that Griffiths was suspended from the practice of law for lying to clients and misusing their funds.  In addition, Griffiths was found guilty of multiple lies committed at different times thereby belying his claim that his criminal conduct was somehow an aberration.  (Def. Mem. at 6-7).  Further, Griffiths testified at trial and his testimony clearly was rejected as not credible by the jury.  Accordingly, the defense claim that Griffiths does not need to be deterred from future criminal conduct (Def. Mem. at 6) is suspect, at best.  Moreover, Griffiths's lack of criminal history already has been taken into account in the Guidelines calculation as he has zero criminal history points and thus is in Criminal History Category I.

     With respect to Griffiths's purported "health issues," (Def. Mem. at 7), the defense does not submit any medical information or records to support any claim that he currently suffers from a medical condition that the Bureau of Prisons would be unable to address adequately.  Similarly, the defendant's family circumstances, namely a teenage daughter in high school and another daughter who is graduating high school, are by no means unique, and, in some ways, are less sympathetic than other

---

salary both retroactive and prospective as well as his lies to the Dormitory Authority were designed to ensure that NETS continued as a viable operation and could obtain its previously withheld member funds, which he intended to take as his supposedly approved retroactive salary as well as a salary on a going forward basis.  The fact that Griffiths did not succeed in his efforts because the FBI and the Dormitory Authority did not believe his lies does not in any way lessen his crimes or run the risk that they will be "overdramatized."  (Def. Mem. at 6).

10

The Honorable Alvin K. Hellerstein
May 9, 2013
page 11 of 12

defendants.  Unlike many defendants who appear before this Court, Griffiths had a law license and worked in a number of professional jobs, including at NETS, and thus had many advantages that a lot of defendants do not have in this society.  Indeed, as shown by the letters submitted by the defendant, Griffiths's wife is employed as a real estate salesperson and has a supportive group of family, friends, community members, and clergy all of whom can assist his family during any period of incarceration.

In addition to recognizing the nature and seriousness of the offenses, a Guidelines sentence also would serve the purposes of affording adequate general deterrence.  See 18 U.S.C. § 3553 (a)(2)(B).  All too often, not-for-profits funded with government money are misused by those entrusted to run the organization.  A non-custodial sentence here would send the wrong message to the public and essentially be a slap on the wrist for conduct that caused real harm and is a serious problem throughout this State.

Finally, and more generally, the Guidelines, are by no means arbitrary; rather, they are the product of deliberate, evolving, and thoughtful consideration of crime and appropriate punishments.  Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," Gall v. United States, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings.  Id. at 596.  See also United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that Booker/Fanfan and Section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").

In sum, the Guidelines remain a fundamental starting point for determining a defendant's sentence; they should not be disregarded particularly where, as here, the remaining factors under 18 U.S.C. § 3553(a) demonstrate that a Guidelines sentence is appropriate.

The Honorable Alvin K. Hellerstein
May 9, 2013
page 12 of 12

## CONCLUSION

    For the reasons set forth above, the Government respectfully requests that the Court impose a sentence on the defendant within the applicable Guidelines range, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

                                           Respectfully submitted,

                                           PREET BHARARA
                                           United States Attorney

                     By:              /s/
                                           Carrie H. Cohen/Justin Anderson
                                           Assistant United States Attorney
                                           Tel.: (212) 637-2264/1035

cc:   Donald D. DuBoulay, Esq. (by ECF and e-mail)